**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> RODOLFO MORA-MORALES and ) <br> JOSE GURROLA-REYES, ) <br> ) <br> Defendants. ) <br> _____) | **CRIMINAL ACTION** <br><br> No. 11-10003-MLB |

**MEMORANDUM AND ORDER**

This case comes before the court on defendants' joint motion to suppress. (Doc. 21).[1] The motion has been fully briefed and the court conducted an evidentiary hearing on April 18, 2011. (Doc. 28). Defendants' motion is granted for the reasons herein.

**I.  Facts**

On November 22, 2010, Trooper Lee Rose, a ten-year veteran with the Kansas Highway Patrol, was patrolling on Interstate 70 in Ellis County, Kansas. Rose observed a Ford pick-up truck traveling with a temporary plate and proceeded to follow the Ford to check if the registration was legal. After inspecting the registration tag from the passing lane, Rose concluded that the registration was proper and slowed down. Rose then observed that the Ford was following another vehicle closely. Rose used a stopwatch to time the following distance. The recommended following distance is 2 seconds and Rose

___

[1] Defendant Mora-Morales (Morales) filed the motion to dismiss (Doc. 21) and defendant Gurrola-Reyes (Reyes) moved to join that motion. (Doc. 22). Defendant Reyes' motion for joinder is granted.

timed Reyes' Ford at 1.81 seconds behind the second vehicle.

Rose activated his emergency lights and stopped the Ford. Rose then approached the Ford on the passenger side.[2] Defendant Reyes, the owner of the Ford, was in the passenger seat. Defendant Morales was driving the Ford. Both defendants are citizens of Mexico. Rose initially informed defendants that he stopped them because they were following another vehicle too closely. Rose asked defendants where they were going and where they had come from. Defendants said they were traveling to Texas and coming from Washington. Rose then asked defendants for their identification and registration. Defendants had already presented these documents at the beginning of the stop. Reyes produced a driver's license from the state of Washington and Morales had a Mexican ID. The Ford was registered to Reyes and Reyes said it was his truck. Rose testified that there was difficulty communicating with defendants. Rose did not speak Spanish and communicated with defendants in English. Rose had to repeat his questions several times and make hand gestures to communicate with defendants.

Rose observed that Reyes was very nervous during the encounter and his hands were visibly shaking when handing over documents. Also, there was an unopened package of Red Bull energy drinks and two air fresheners in the Ford. Defendants were dressed in black matching jackets, new shoes and had rings on their fingers.

Rose returned to the patrol car to check the documents. Trooper Jerrad Goheen arrived to provide safety back-up to Rose. He had been

---

[2] A video of the stop admitted into evidence. The video had a significant amount of background noise and, at times, it was impossible to hear what Rose said. The video rarely caught responses, if any, from defendants.

at the end of his shift and traveling home when he observed Rose stopped on the interstate. Goheen did not activate his recorder. He initially had a conversation with Rose about defendants. While Rose checked on defendants' documents, Goheen approached the Ford. Goheen spoke to Reyes in Spanish and asked him where they were going and where they had come from.[3] Goheen then began to speak in English and questioned Reyes about a license plate in the bed of the truck. Both Goheen and Reyes attempted to communicate through hand gestures. Goheen urged Reyes out of the Ford with hand gestures and then pointed to the bed. Reyes climbed in the bed of the Ford and retrieved the plate. Reyes was pointing at the plate and then pointing at the bumper of the Ford. Goheen testified that Reyes was trying to tell Goheen that the plate was from the previous owner. Goheen testified that there were difficulties in communicating with Reyes.

At this point, Rose had finished checking the documents and decided to give defendants a warning. Goheen stepped to the back of the Ford and Rose walked to the passenger window. Rose is heard on the video telling defendants that he is just giving them a warning. Rose tells them to keep further back and tells defendants to have a nice trip. Rose takes two steps away from the Ford and then turns back towards the window. Rose says, "Before you go, can I ask you some questions?" Defendants do not respond. Rose asks this question three times in different ways. There is no response from defendants on the video and Rose does not recall if defendants responded to his question. Rose then asks if he can search the truck. Rose asks this

---

[3] Goheen testified that his Spanish is limited to those two phrases and an additional phrase which will be discussed shortly.

-3-

question four times.  The last time he asks, Rose is pointing at his eyes and then pointing in the truck and making motions with his hands. Rose then backs up and makes a hand motion to Reyes and tells him to step out.  At this point, Goheen steps up to the passenger window. Goheen attempts to ask the question in Spanish.[4]  After the first question, Reyes says "como," which means "what" in Spanish.  Goheen then repeats his question and Reyes says "truck."  The entire time Goheen is talking, he is making hand gestures.  Reyes ultimately steps out of the Ford.

Morales then steps out of the Ford.  The video shows that both Rose and Goheen go to the back of the Ford.  Reyes then attempts to go to the driver's side door and is immediately motioned to back away from the Ford.[5]  The Ford was transported and searched at an office of the Highway Patrol.  The search revealed two duffle bags which were

---

[4] There is a dispute as to what is said by Goheen.  Goheen testified that he said, "Puedo buscar su carro por drugas?"  The interpreter at the hearing stated that this means "I look in your car for drugs."  Officer Eddie Padron of the Wichita Police Department testified that it means, "Can I search your car for drugs?"  At the hearing which was held when this case was initially in state court, however, Goheen testified that he asked a question in Spanish which was translated to "I look at your car" or "I look for your car." There was no mention of drugs in the state court proceeding, which is discussed infra at n. 6.  Both defendants also testified at the hearing held in this court.  Reyes testified that he understood Goheen to say "Puedo pescar su trucka," which was translated to "I can fish in your truck."  Morales testified that Goheen said "Quiero pescar," which means "I want to fish."  The court does not believe that it is necessary to determine what exactly was said by Goheen because, as discussed infra, defendants had not voluntarily consented to an extended encounter with Rose and Goheen.

[5] Reyes testified that he did not understand that the troopers were asking to search the Ford.  Reyes believed that he was to get out of the Ford and change places with Morales because Reyes was the only one who had a driver's license.  Reyes, therefore, attempted to go back into the Ford and was stopped from doing so by the troopers.

behind the driver and passenger seats. The duffle bags contained a large quantity of ecstasy pills.

Defendants move to suppress the search and seizure of evidence from the Ford on the basis that it was seized after an unlawful search.

**II. Analysis**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Supreme Court has liberally interpreted "seizures" to encompass routine traffic stops, "even though the purpose of the stop is limited and the resulting detention quite brief." See Delaware v. Prouse, 440 U.S. 648, 653 (1979). "Because an ordinary traffic stop is more analogous to an investigative detention than a custodial arrest," the stops are analyzed under the principles articulated in Terry v. Ohio. United States v. King, No. 05-6399 (10th Cir. Dec. 18, 2006). The two-pronged standard espoused in Terry v. Ohio, 392 U.S. 1 (1968), thus applies, see United States v. Caro, 248 F.3d 1240, 1244 (10th Cir. 2001), and renders a traffic stop reasonable if "the officer's action was justified at its inception, and [if] it was reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 20. An initial traffic stop is justified at its inception if it was "based on an observed traffic violation," or if "the officer has a reasonable articulable suspicion that a traffic . . . violation has occurred." United States v. Hunnicutt, 135 F.3d 1345, 1348 (10th Cir. 1998).

The court finds that Rose was justified in stopping the Ford in

-5-

the first instance. It is irrelevant that Rose may have had subjective motives for stopping the Lincoln. Hunnicutt, 135 F.3d at 1348. Defendants argue that Rose was several car lengths behind defendants and therefore could not see defendants follow too closely. The court, however, accepts Rose's testimony that he believed defendant committed a traffic infraction when following the other vehicle too closely. K.S.A. 8-1523(a).

Even when the initial stop is valid, any investigative detention must not last "longer than is necessary to effectuate the purpose of the stop." Florida v. Royer, 460 U.S. 491, 500 (1983). An officer "conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation." United States v. Bradford, 423 F.3d 1149, 1156 (10th Cir. 2005). The uncontroverted testimony shows that Rose approached the Ford upon initially stopping it and then obtained defendants' driving documents. Rose returned to his patrol car to write out the warning ticket, which was appropriate. Rose re-approached the Ford, returned defendants' papers and issued the warning. Therefore, the scope of the traffic stop was reasonably related in scope to the circumstances which initially justified the interference. Terry, 392 U.S. at 20.

After the purpose of the traffic stop is complete, however, "further detention for purposes of questioning unrelated to the initial stop" is generally impermissible. Bradford, 423 F.3d at 1156-57. In general, "lengthening the detention for further questioning beyond that related to the initial stop is permissible in two circumstances. First, the officer may detain the driver for questioning unrelated to the initial stop if he has an objectively

reasonable and articulable suspicion illegal activity has occurred or is occurring. Second, further questioning unrelated to the initial stop is permissible if the initial detention has become a consensual encounter." Hunnicutt, 135 F.3d at 1349.

In this case, Rose's further questioning of defendants was not consensual. To determine whether voluntary consent was given, the court must utilize a two-part test: "First, the government must proffer 'clear and positive testimony that consent was unequivocal and specific and freely given.' Furthermore, the government must prove that this consent was given without implied or express duress or coercion." United States v. Zubia-Melendez, 263 F.3d 1155, 1162 (10th Cir. 2001). The existence of a language barrier between the troopers and defendants is also relevant to whether Reyes consented. United States v. Flores-Ocampo, No. 05-3257, 2006 WL 856220, *5 (10th Cir. April 4, 2006)(citing United States v. Hernandez, 913 F.2d 1506, 1510 (10th Cir. 1990)). The Tenth Circuit has held that a "working knowledge" of the English language is all that is required for an encounter to be consensual. United States v. Zubia-Melendez, 263 F.3d 1155, 1163 (10th Cir. 2001). A "working knowledge" exists if the individual has "sufficient familiarity with the English language to understand and respond" to the trooper's questions. Id.

The evidence in this case is that defendants had significant difficulties understanding the troopers. The video demonstrates that the troopers repeatedly had to ask questions several times and utilize hand motions in an attempt to communicate. Rose's attempt to gain consent to an extended encounter was never understood by defendants. Rose then attempted to ask for permission to search which was also not

understood. By the time Goheen attempted to ask the question in Spanish, both Rose and Goheen had made several hand motions to defendants which could be seen on the video as motions to exit the Ford. It is the government's burden to establish that consent was "unequivocal and specific and freely given," and it has not met its burden in this case.[6] Thus, the validity of the search and subsequent seizure of the ecstasy turns on the existence of a reasonable and articulable suspicion of illegal activity.

In determining whether reasonable suspicion exists, the court again looks to the "totality of the circumstances" to determine if Rose had a "particularized and objective basis for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002). Reasonable suspicion may exist even if each factor alone is "susceptible of innocent explanation." Id. at 277 (stating that "[a] determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct"). A determination of reasonable suspicion to detain after a traffic stop should be based on the totality of the circumstances. United States v. Salzano, 158 F.3d 1107, 1111 (10th Cir. 1998).

In making the determination, each factor is not to be considered in isolation because even though one factor alone may be innocently explained, the factors considered together can support reasonable suspicion. United States v. Lopez, 518 F.3d 790, 797 (10th Cir.

---

[6] Notably, this case was originally initiated in Ellis County, Kansas District Court. In that case, defendants also filed a motion to suppress and a hearing was held on December 14, 2010. Prior to a decision on the motion to suppress, however, defendants were indicted in this court and the prosecuting attorney moved to dismiss the state action on January 7, 2011.

-8-

2008). The court must "be careful to judge the officer's conduct in light of common sense and ordinary human experience but also to grant deference to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances." Id.

After considering all of the circumstances surrounding the stop, the court finds that Rose did not have reasonable suspicion to believe that the Ford contained narcotics. Rose based his suspicions on the following facts: nervousness, air fresheners in the Ford, energy drinks, new clothes, recent registration and that Washington is a source state for drugs. First, "nervousness is of limited significance in determining reasonable suspicion." United States v. Salzano, 158 F.3d 1107, 1113 (10th Cir. 1998)("the government's repetitive reliance on . . . nervousness . . . 'must be treated with caution.'") Moreover, nervousness is further diminished due to the language difficulty. Second, the presence of air fresheners in the Ford alone "cannot provide a reasonable suspicion that drugs are present." United States v. Dove, No. 95-1415, 1996 WL 327456, *3 (10th Cir. June 14, 1996). There were only two air fresheners in the Ford and there was no evidence that two air fresheners is excessive in a truck. Id. (the presence of three air fresheners was not suspicious without other identifiable suspicious activity); see also United States v. Kaguras, No. 05-8103, 2006 WL 1585989 (10th Cir. June 9, 2006)(a rental car and the smell of air freshener did not give rise to objective, reasonable suspicion).

The remaining factors, energy drinks, new clothes, recent

-9-

registration and that Washington is a source state for drugs[7] are not sufficient to rise to the level of reasonable suspicion. "Although [the court] will consider factors that could have an innocent explanation, there must be something to indicate that criminal activity is afoot." Kaguras, 2006 WL 1585989, *7.

Based on many cases such as this one, the court knows that experienced, well-trained officers such as Trooper Rose have the ability to distinguish between innocent and suspicious circumstances. The court is always reluctant to make a ruling which seems to be second-guessing an officer who was on the scene. Nevertheless, this is one of those relatively rare cases where the totality of the circumstances does not give rise to reasonable suspicion. Accordingly, defendants' joint motion to suppress is granted. (Doc. 21).

IT IS SO ORDERED.

Dated this __21st__ day of April 2011, at Wichita, Kansas.

                                                  s/ Monti Belot
                                                  Monti L. Belot
                                                  UNITED STATES DISTRICT JUDGE

---

[7] While this is undoubtedly true, its relevance is becoming shopworn because, based on the testimony in dozens' of similar motions, virtually every large city in every state has become a "known drug source."